UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

JESSE LYLE GEHRKE,

                    Petitioner,

        v.

R. SULLIVAN, Warden,

                    Respondent.

CASE NO. 07cv0575 IEG (LSP)

REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE
JUDGE RE: DENIAL OF
PETITION FOR WRIT OF HABEAS
CORPUS

**I.**

**INTRODUCTION**

Jesse Lyle Gehrke, a state prisoner proceeding pro se, has filed a Second Amended Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 challenging his San Diego Superior Court conviction in case number SCS184975 for assault with a deadly weapon and assault by a life prisoner. Respondent has filed an Answer to the Second Amended Petition. Petitioner has filed a Traverse to Respondent's Answer.

The Court has considered the Second Amended Petition, Respondent's Answer, Petitioner's Traverse and all the supporting documents submitted by the parties. Based upon the documents submitted, and for the reasons set forth below, the Court recommends

1    that the Petition be **DENIED**.

2                                    **II.**

3                         **FACTUAL BACKGROUND**

4        The following statement of facts is taken from the appellate

5    court opinion denying Petitioner's habeas petition.   This Court

6    gives deference to state court findings of fact.   *See Sumner v.*

7    *Mata*, 499 U.S. 539, 545-47 (1981).

8    **A.    PROSECUTION CASE**

9             On the morning of February 12, 2004, Mr. Bennett (a
         correctional officer at Donovan State Prison) observed
10       Williams (an inmate) enter a prison exercise yard.   Gehrke
         and a third inmate (Muncy) entered the yard after Williams.
11       Gehrke was a life prisoner and Williams's cellmate.

12            A fight subsequently ensued with Williams battling
         Gehrke and Muncy.   Gehrke reached Williams first, approaching
13       him from behind and striking him in the upper back, while
         Muncy approached Williams from the front.   As Gehrke
14       continued to strike Williams, Muncy also began hitting
         Williams.

15

16            Bennett activated his alarm and verbally commanded the
         inmates to get down.   When Gehrke continued striking
17       Williams, Bennett fired a nonlethal round, striking Gehrke,
         but Gehrke continued to strike Williams.   It required several
18       more commands and rounds of nonlethal ammunition before
         Gehrke ceased his attack.   After the fourth round, Gehrke
19       broke off his attack and ran toward a urinal carrying an
         inmate manufactured weapon.   Gehrke flushed the item down the
20       toilet.   Bennett ordered Muncy to get down, and fired a round
         at Muncy, after which both Gehrke and Muncy ran to a wall and
21       assumed a prone position.

22            Williams suffered multiple puncture wounds across his
         back, and also had wounds to his chest, abdomen, and leg.
23       The puncture wounds to his back and chest were the most
         serious injuries.   Williams was life-flighted to a hospital
24       for treatment, including surgery.

25   **B.    THE DEFENSE CASE**

26            Muncy testified he was acquainted with Gehrke and
         Williams.   That morning, Muncy entered the exercise yard
27       after Gehrke and Williams.   Gehrke and Williams hugged, and
         Muncy gave each of them a hug.   Muncy started to put his
28       shirt away but, when he turned around, saw Williams

approaching in a violent manner with his fists clenched. Muncy was surprised, and reacted by pulling out his dagger. Muncy stabbed Williams in the leg while Williams was flat on his back on the ground. The fight ended when Bennett shot Muncy in the arm; Muncy ran to a nearby wall, wrapped up his dagger, and secreted it away. Gehrke did not strike Williams and had no weapon.

(Respondent's Lodgment (hereinafter "Resp't Lodgment") No. 6 at 2-3.)

### III.

### PROCEDURAL BACKGROUND

On May 5, 2005, the San Diego District Attorney charged Gehrke in an amended information with premeditated attempted murder, assault with a deadly weapon/force likely to cause great bodily injury, and assault by a life prisoner. (Resp't Lodgment No. 1 at 23-24, No. 3 at 1.)  The information further alleged that Gehrke had been convicted of assault with a firearm and great bodily injury in 1996 and first degree murder in 2003, which qualified as two strikes under California's Three Strikes Law, and as serious-felony prior convictions.  (Resp't Lodgment No. 1 at 23-26, 29.)

On June 8, 2005, a jury convicted Gehrke of assault with a deadly weapon/force likely to cause great bodily injury and assault by a life prisoner.  (Resp't Lodgment No. 1 at 125-126.) The jury further found that in the commission of these offenses, Gehrke personally inflicted great bodily injury upon Williams during a group beating.  (*Id.*)  The jury found Gehrke not guilty of attempted voluntary manslaughter and attempted murder.  (*Id.* at 123-124.)  The trial court imposed a sentence of forty years to life, comprising a term of 27 years to life under the Three Strikes Law for assault by a life prisoner.  (*Id.* at 150, Resp't

1   Lodgment No. 2 at 423-429.)  The trial court arrived at 27 years

2   by tripling the base term of life imprisonment with the

3   possibility of parole in nine years.  (Resp't Lodgment No. 1 at

4   150, Resp't Lodgment No. 2 at 423-429.)  The trial court

5   aggregated upon this sentence ten years for the two serious-felony

6   prior convictions and three years for the great bodily injury

7   during a group beating enhancement.  (Resp't Lodgment No. 1 at

8   150, Resp't Lodgment No. 2 at 423-429.)

9       On August 31, 2005, Gehrke timely filed a Notice of Appeal in

10  the California Court of Appeal, Fourth Appellate District.

11  (Resp't Lodgment No. 3 at 2.)  His appeal raised two issues: (1)

12  that the trial court abused its discretion in placing Gehrke in

13  physical restraints during trial; and (2) that the trial court

14  improperly instructed the jury that Gehrke may be found guilty of

15  great bodily injury as the result of a group beating.  (Resp't

16  Lodgment No. 3 at 5, 14.)

17      On September 12, 2006, the California Court of Appeal denied

18  both of Gehrke's claims in an unpublished opinion.  (Resp't

19  Lodgment No. 6.)  The court determined that (1) the trial court

20  had properly found a manifest necessity for restraining Gehrke

21  after conducting an evidentiary hearing into Gehrke's history of

22  violence; and (2) the trial court had properly instructed the jury

23  of the circumstances under which a defendant can be liable for

24  personally inflicting great bodily injury.  (*Id.* at 4-11.)

25      On October 12, 2006, Gehrke filed a Petition for Review in

26  the California Supreme Court.  (Resp't Lodgment No. 7.)  In the

27  Petition, he raised only the issue regarding his shackling at

28  trial, stating the issue as follows: "Whether shackling a prisoner

during trial violated his right to due process under the Fifth and
Fourteenth Amendments to the United States Constitution." (Resp't
Lodgment No. 7 at 2.)  Gehrke neglected to raise the jury
instruction issue to the California Supreme Court.  On November
15, 2006, the California Supreme Court declined further
discretionary review without comment. (Resp't Lodgment No. 8.)

On July 30, 2007, Gehrke timely filed in this Court his
currently pending Second Amended Petition for Writ of Habeas
Corpus.  The Petition raises two grounds for relief: (1) that the
trial court denied Gehrke his right to due process by requiring
him to be shackled during trial; and (2) that the trial court
denied Gehrke his right to due process by instructing the jury
that he could be liable for inflicting injury if he participated
in a group beating of the victim.  (Petition at 6, 9.)

On November 1, 2007, Respondent filed an Answer to Second
Amended Petition for Writ of Habeas Corpus and Memorandum of
Points and Authorities in Support Thereof.  On November 19, 2007,
Petitioner filed a Traverse to Respondent's Answer.

**IV.**

**DISCUSSION**

A.   SCOPE OF REVIEW

Title 28, United States Code, § 2254(a), sets forth the
following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit
> judge, or a district court shall entertain an
> application for a writ of habeas corpus in behalf of a
> person in custody pursuant to the judgment of a State
> court only on the ground that he is in custody in
> violation of the Constitution or laws or treaties of the
> United States.

28 U.S.C.A. § 2254(a) (West 1994) (emphasis added).

07cv0575

1    The current petition is governed by the Anti-terrorism and

2 Effective Death Penalty Act of 1996 ("AEDPA").  *See Lindh v.*

3 *Murphy*, 521 U.S. 320 (1997).   As amended, 28 U.S.C. § 2254(d)

4 reads:

5          (d) An application for a writ of habeas corpus on
       behalf of a person in custody pursuant to the judgment
6       of a State court shall not be granted with respect to
       any claim that was <u>adjudicated on the merits</u> in State
7       court proceedings unless the adjudication of the claim –

8              (1) resulted in a decision that was
          contrary to, or involved an unreasonable
9          application of, clearly established Federal
          law, as determined by the Supreme Court of the
10          United States; or

11              (2) resulted in a decision that was based
          on an unreasonable determination of the facts
12          in light of the evidence presented in the
          State court proceeding.
13
14 28 U.S.C.A. § 2254(d)(1)-(2) (West Supp. 2004) (emphasis added).

15    To obtain federal habeas relief, Gehrke must satisfy either

16 § 2254(d)(1) or § 2254(d)(2).  *See Williams v. Taylor*, 529 U.S.

17 362, 403 (2000).  The Supreme Court interprets § 2254(d)(1) as

18 follows:

19       Under the "contrary to" clause, a federal habeas court
       may grant the writ if the state court arrives at a
20       conclusion opposite to that reached by this Court on a
       question of law or if the state court decides a case
21       differently than this Court has on a set of materially
       indistinguishable facts.  Under the "unreasonable
22       application" clause, a federal habeas court may grant
       the writ if the state court identifies the correct
23       governing legal principle from this Court's decisions
       but  unreasonably applies that principle to the facts of
24       the prisoner's case.

25 *Williams*, 529 U.S. at 412-13; *see Lockyer v. Andrade*, 538 U.S. 63,

26 73-74 (2003).

27    Where there is no reasoned decision from the state's highest

28 court, the Court "looks through" to the underlying appellate court

- 6 -                                           07cv0575

decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991).  If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law.  *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Lockyer*, 538 U.S. at 75-76); *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).  However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim.  *Early v. Packer*, 537 U.S. 3, 8 (2002).  "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" *id.*, the state court decision will not be "contrary to" clearly established federal law.  *Id*.

**B.    ANALYSIS**

**1.    The California Court of Appeal Reasonably Rejected Gehrke's Claim Regarding Shackling**

Gehrke alleges that the trial court deprived him "of his federal constitutional rights to due process under the Fifth and Fourteenth Amendments to the United States Constitution when it abused its discretion in placing Petitioner in physical restraints during trial." (Petition (hereinafter "Petition") at 1-2.)  He argues that the fact that he was shackled in full view of the jury gave the jury the presumption that Petitioner was guilty.  (*Id.* at 6-8.)  He claims that there was no justification for placing him in restraints and that simply shackling him to a bolt in the floor, out of the jury's view, would have sufficed.  (Pet. at 6-7.)  Respondent argues that Petitioner's due process rights were

1    not violated.

2        As noted above, the California Supreme Court denied

3    Petitioner's claim without comment. (Resp't Lodgment No. 8.)

4    Thus, this Court must "look through" to the last reasoned state

5    court decision to address the claim, the appellate court opinion

6    denying his appeal of his conviction, as the basis of its

7    analysis.  *Ylst*, 501 U.S. at 801-06.

8        In a reasoned analysis, the California Court of Appeal

9    rejected Gehrke's claim:

10        *The Evidentiary Basis for the Ruling*

11            The court independently found on the record that there
         was a manifest need to restrain Gehrke based on his criminal
12        history, the current charges, his outbursts in courtroom
         settings, his recent escape attempt, and the security
13        concerns posed by the layout of the courtroom.

14            The court, noting Gehrke had a long history of violent
         offenses, observed that Gehrke was serving a life sentence
15        for first degree murder committed by a stabbing, was facing
         trial for another stabbing offense, and another stabbing
16        implement had been found in his prison cell a few months
         earlier.  Moreover, the court expressed concern that Gehrke's
17        pattern of violent outbursts did not abate in a courtroom
         setting despite the presence of law enforcement officers.
18        When the jury returned a guilty verdict against him in May
         2003, Gehrke (despite being in ankle chains) used his hands
19        to overturn the counsel table while yelling at the jury, and
         three officers were required to subdue him.  Moreover, a few
20        minutes before the court hearing on shackling in this case
         began, Gehrke resisted an officer and created a disturbance
21        that required "[a]ll the law enforcement people that you see
         here—and I think some others—...to calm him down."

22
            The court's concern with Gehrke's violent tendencies and
23        courtroom outbursts, together with Gehrke's willingness to
         employ "small stabbing instruments" like "stuff around the
24        courtroom" within his reach, was magnified by the particular
         security issues presented by the configuration of the
25        courtroom.  The court expressed concern for the safety of
         staff, counsel and witnesses because the courtroom was small,
26        and a witness against Gehrke "literally has to walk...less
         than a couple of feet in front of" where Gehrke sat at the
27        counsel table, and the witness stand is "right next to...the
         defendant...."  The trial court stated that Gehrke's "ability
28        even with one hand free to throw a table or interfere with
         this trial based on [his] past performance is significant in

                                    - 8 -                          07cv0575

my mind to say that he is a danger."

Finally, the court noted that Gehrke, a life prisoner who earned "level 2" status under California's Department of Corrections policies (requiring CDC officers to restrain him in order to control him), was a flight risk and had recently offered a $100,000 bribe to a transporting officer to let him escape.

Based on the court's concerns for safety and the potential flight risk, the court ruled there was a manifest need to restrain Gehrke, and he would be restrained at both his feet and wrists.

*Analysis*

Gehrke's violent behavior (both in and out of court), his willingness to possess and use small stabbing implements like those available in the courtroom, particularly considering the cramped courtroom layout, and his willingness to try to escape custody, provide a sufficient basis for the court's order restraining Gehrke at trial.

Gehrke argues this evidence did not justify the order. He asserts his violent outburst at the end of his prior trial should be disregarded because he did not disturb the proceedings during the prior trial. However, Gehrke's long history of violent behavior resurfaced just moments before the court hearing on shackling, and his outburst required the services of numerous law enforcement personnel to "calm" him, and the court could infer his anger management skills had deteriorated since his previous trial. Gehrke's willingness to keep forbidden weapons and to employ them against those who affronted him, even in full view of law enforcement personnel, raised particularized safety concerns in the cramped space of the courtroom. Finally, Gehrke's effort to escape by offering a $100,000 bribe could permit a court to conclude he was showing signs of increasing desperation and might take even more extreme actions if not shackled.

Gehrke asserts the order was an abuse of discretion because many of the factors cited by the court have been deemed an improper basis for shackling. The courts have found that the layout of the courtroom, even if the defendant is charged with a violent offense, will not alone suffice to justify shackling. (See, e.g., *People v. Seaton* (2001) 26 Cal.4th 598, 651-652.) However, the *Seaton* court found shackling to be improper because there was no record of any individualized concerns that the defendant would engage in nonconforming behavior (*ibid*), and the present case had ample evidence to support such a concern. Similarly, the cases holding that it is an insufficient basis to order shackling merely because the defendant is serving a life sentence (see *People v. Hawkins* (2000) 23 Cal.4th 101, 110), or because law enforcement personnel favor shackling (see *People v.*

> *Ceniceros* (1994) 26 Cal.App.4th 266), are inapposite because (unlike *Hawkins* or *Ceniceros*) the court here had specific individualized concerns that Gehrke's pattern of violence, both in and out the courtroom, created a danger to the public.  We conclude the shackling order was not an abuse of discretion.

(Resp't Lodgment No. 6 at 6-9.)

A "defendant has the right to be free from shackles and handcuffs in the presence of the jury, unless shackling is justified by an essential state interest." *Ghent v. Woodford*, 279 F.3d 1121, 1132 (9th Cir. 2002); *see also Rhoden v. Rowland*, 172 F.3d 633, 636 (9th Cir. 1999); *Holbrook v. Flynn*, 475 U.S. 560, 568-69 (1986); *Illinois v. Allen*, 397 U.S. 337 (1970).  In order for a defendant who was shackled during trial to prevail on a claim that his due process rights were violated, "a court must find that the defendant was indeed physically restrained in the presence of the jury, that the shackling was seen by the jury, and that the physical restraint was not justified by state interests." *Ghent*, 279 F.3d at 1132.  The shackling rises to the level of a constitutional error only if the defendant then shows that he suffered prejudice as a result of the shackling.  *Id; see also Castillo v. Stainer*, 997 F.2d 669, 669 (9th Cir. 1993)(finding that if there is a constitutional error, "court next must ask whether the error had a 'substantial and injurious effect' on the jury's verdict).  However, because shackling before the jury is so likely to cause a defendant prejudice, "due process requires the trial court to engage in an analysis of the security risks posed by the defendant and to consider less restrictive alternatives before permitting a defendant to be restrained." *Rhoden*, 172 F.3d at 636.

In *Deck v. Missouri*, 544 U.S. 622 (2005), the U.S. Supreme

Court held the limitation on restraints is encompassed by federal constitutional protections, stating "the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." *Id.* at 629.  The Court explained that "courts cannot routinely place defendants in shackles or other physical restraints visible to the jury...The constitutional requirement, however, is not absolute.  It permits a judge, in the exercise of his or her discretion, to take account of special circumstances, including security concerns, that may call for shackling." *Id.* at 633.  The Court recognized the need to restrain dangerous defendants to prevent courtroom attacks or the need to give trial courts latitude in making individualized security determinations, but cautioned that such determinations must be case specific: "that is to say, it should reflect particular concerns, say special security needs or escape risks, related to the defendant on trial." *Id.*  The Court concluded that, "given their prejudicial effect, due process does not permit the use of visible restraints if the trial court has not taken account of the circumstances of the particular case." *Id.* at 632.

The Court granted relief to the defendant in *Deck* because the evidence in the record demonstrated that (1) the jurors were aware of the defendant's restraints; (2) the trial court did not make any formal or informal findings justifying the restraints such as a risk of escape or a threat to courtroom security, or explaining why the chosen restraints were necessary; and, (3) the shackling of the defendant was "inherently prejudicial," so that it could

not be upheld without adequate justification. *Id.* at 633-635.

In the present case, Gehrke was shackled to the floor, placed in a waist chain, and required to wear handcuffs. (Resp't Lodgment No. 2 at 2, No. 4 at 6.)  The table at which Gehrke was seated throughout the trial was covered so that his legs were not visible to the jury. (Resp't Lodgment No. 2 at 3, No. 4 at 6.) He was brought to the courtroom before the jury entered the courtroom and removed from the courtroom after the jury departed, so the jury never observed his movements. (Resp't Lodgment No. 2 at 3, No. 4 at 6.)  Thus, Gehrke's shackles were substantially concealed from the jury. (Resp't Lodgment No. 2 at 3, No. 4 at 6.)  However, after defense counsel requested, and the court granted, permission to have Gehrke's right handcuff lengthened to enable him to write and take notes during trial, his restraint may have become apparent to the jury. (Resp't Lodgment No. 2 at 105, No. 4 at 6.)

On May 26, 2005, an evidentiary hearing on the shackling issue was held. (Resp't Lodgment No. 2 at 2-12.)  After the evidentiary hearing was held, the trial court ordered Gehrke to remain shackled. (*Id.* at 11-12.)  The court based its decision to shackle Gehrke on security concerns derived from his criminal background and current charges, history of disorderly incidents in the courtroom, security concerns posed by the layout of the courtroom, and evidence of conduct suggesting he posed a flight risk. (Resp't Lodgment No. 2 at 2-12, No. 4 at 7.)  The court began by observing that Gehrke had been found to possess prison-made weapons while incarcerated at the California Department of Corrections (hereinafter "CDC"), had sustained a conviction for

doing so, and presently faced charges involving similar conduct. (Resp't Lodgment No. 2 at 5-6, No. 4 at 7.)  The court noted that contraband weapons are typically small, and considered the fact that small instruments available for use as a weapon, including pens, are commonly found in the courtroom.  (Resp't Lodgment No. 2 at 103, No. 4 at 7.)

The court observed that CDC representatives considered Gehrke to be a level 2 inmate requiring restraint in order to gain compliance and that CDC policy requires that life prisoners be shackled.  (Resp't Lodgment No. 2 at 6, 104; No. 4 at 7.)  The court consulted with numerous deputy sheriffs who opined that Gehrke should be shackled and that he posed a danger in the courtroom.  (Resp't Lodgment No. 2 at 7, 104; No. 4 at 7.)  The court observed that the courtroom was small and that witnesses would have to pass within two feet of Gehrke.  (Resp't Lodgment No. 2 at 104, No. 4 at 7.)  Additionally, the witness stand was adjacent to Gehrke's seat, and with one hand free, his ability to throw objects, overturn counsel table, or otherwise interfere with the trial, was, in the court's mind, a significant factor to consider.  (Resp't Lodgment No. 2 at 104, No. 4 at 7.)

The court reviewed notes regarding an incident which occurred in court on May 23, 2003, when a verdict against Gehrke was announced and he pushed over a counsel table and began yelling loudly.  (Resp't Lodgment No. 2 at 6-7, No. 4 at 7.)  Three deputy sheriffs were required to subdue him.  (Resp't Lodgment No. 2 at 7, No. 4 at 7.)  At the time, Gehrke was restrained only by ankle chains.  (Resp't Lodgment No. 2 at 6-7, 103; No. 4 at 7.)

The court also considered evidence that Gehrke posed a flight

risk in that he had recently offered $100,000.00 to a CDC

transporting officer for assistance in escaping from prison.

(Resp't Lodgment No. 2 at 6, 11; No. 4 at 8.)

Immediately before the court examined the shackling issue,

the prosecutor related that Gehrke had created a disturbance in

the courtroom requiring law enforcement officers to intervene.

(Resp't Lodgment No. 2 at 4, No. 4 at 8.)  Gehrke and his counsel

explained that he reacted when he was placed in handcuffs without

warning despite the fact that he had a broken hand.  (Resp't

Lodgment No. 2 at 4, No. 4 at 8.)  The court called upon the CDC

representative, Mr. Clark, to explain.  (Resp't Lodgment No. 2 at

9-10, No. 4 at 8.)  Clark explained that Gehrke needed to be kept

in restraints, because when he uncuffed Gehrke's right hand,

Gehrke stood up and caused a commotion.  (Resp't Lodgment at 9-10,

No. 4 at 8.)

The judge determined that Gehrke would remain shackled.

(Resp't Lodgment No. 2 at 105, No. 4 at 8.)  However, he did relax

Gehrke's restraints at the defense counsel's request by

lengthening his wrist chains, thereby allowing him to take notes

and communicate in writing with his attorney during trial.

(Resp't Lodgment No. 2 at 105, No. 4 at 8.)  Additionally, the

court advised the jury that the fact that Gehrke had been placed

in restraints was not evidence of guilt and could not be

considered by them for any purpose.  (Resp't Lodgment No. 2 at

352, No. 4 at 8.)

As these facts demonstrate, the trial court examined the

circumstances regarding the necessity of Gehrke's restraints.

(Resp't Lodgment No. 2 at 5.)  In conducting a case specific

07cv0575

inquiry, the trial court determined and entered findings that Gehrke presented an obvious danger to court staff, counsel, witnesses, the jury, and the public.  (*Id.* at 7-8.)  Central to the court's decision to restrain Gehrke was the fact that Gehrke had a history of violence and courtroom disturbances and had attempted to bribe an officer to help him escape.  (*Id.* at 4, 6-7, 9-11, 103-104.)  Furthermore, during the evidentiary hearing, the trial court considered alternatives to shackling, which it rejected, although it did allow lengthening of Gehrke's handcuffs so he could take notes and communicate with counsel during trial.  (*Id.* at 105.)  Although lengthening the handcuff restraint made the restraints visible to the jury, the court admonished the jury that it was not to consider Gehrke's shackles for any purpose.  (*Id.* at 352.)  Since the trial court exercised its discretion reasonably and considered less restrictive alternatives to shackling, the Court RECOMMENDS that Petitioner's claim in this regard be DENIED.

> **2.  Gehrke's Claim in Ground Two is Unexhausted, But It is Not Cognizable on Federal Habeas Review and, Thus, May be Denied on Its Merits**

Gehrke alleges that he was "deprived of his federal constitutional rights to due process under the Fifth and Fourteenth Amendments to the United States Constitution when the trial court improperly instructed the jury that petitioner may be found guilty of great bodily injury as the result of a group beating."  (Pet. at 9.)  Gehrke argues that he was denied due process and the right to a fair trial when the trial court instructed the jury pursuant to CALJIC No. 17.20 because the

07cv0575

faulty instruction allowed the jury to infer that he was guilty based on the fact that he was in the general area of the attack. (Pet. at 9.)   Gehrke further claims that the jury instruction allowed the jury to find "proof of an element of a crime on a standard less demanding than beyond a reasonable doubt."   (Pet. at 9.)

The trial court instructed the jury pursuant to CALJIC No. 17.20, as follows:

> It is alleged in Counts 1, 2, and 3 that in the commission of a felony or attempted felony the defendant personally inflicted great bodily injury on a person, inmate Williams, not an accomplice to the crime.  If you find a defendant guilty of the felony, you must determine whether that person inflicted great bodily injury to some person not an accomplice to the crime in a commission or attempted commission of the felony.

> Great bodily injury as used in this instruction means a significant or substantial physical injury.  Minor, trivial, or moderate injuries do not constitute great bodily injury. When a person participates in a group beating and it is not possible to determine which assailant inflicted a particular injury, he may be found to have personally inflicted great bodily injury upon the victim if, one, the application of unlawful physical force upon the victim was of such a nature that by itself it could have caused the great bodily injury suffered by the victim; or, two, that at the time the defendant personally applied unlawful physical force to the victim the defendant knew that other persons as part of the same incident had applied, were applied, or would apply unlawful physical force upon the victim and the defendant knew or reasonably should have known that the cumulative effect of all the unlawful physical force would result in great bodily injury to the victim.

> The people have the burden of proving the truth of this allegation.  If you have a reasonable doubt that it is true, you must find it to be not true.  Include a special finding on that question in your verdicts using a form that will be supplied for that purpose.

> If you are not satisfied beyond a reasonable doubt that a defendant is innocent of the crimes for which he is accused in Counts 1, 2, and 3, and you unanimously so find, you may convict him of any lesser crime provided you are satisfied beyond a reasonable doubt that he is guilty of that crime.

1   (Resp't Lodgment No. 2 at 370-371.)

2        Gehrke raised this jury instruction claim on direct appeal in

3   the Court of Appeal (Resp't Lodgment No. 3 at 14), but he did not

4   raise it in his Petition for Review in the California Supreme

5   Court. (Resp't Lodgment No. 7).   Therefore, Gehrke's claim is

6   unexhausted. Generally, before a federal court may grant relief on

7   a habeas corpus petition, all claims must be exhausted. *Jackson*

8   *v. Roe*, 425 F.3d 654m 658 (9th Cir. 2005)(citing *Rose v. Lundy*,

9   455 U.S. 509, 522 (1982).

10       The exhaustion requirement is satisfied by providing the

11  state courts with a "fair opportunity" to rule on Petitioner's

12  constitutional claims. *Anderson v. Harless*, 459 U.S. 4, 6 (1982).

13  In most instances, a claim is exhausted once it is fairly

14  presented to a state's highest court, either on direct appeal or

15  through state collateral proceedings.[1] *See Sandgathe v. Maass*,

16  314 F.3d 371, 376 (9th Cir. 2002).   To present a claim fairly,

17  Petitioner must alert the state court to the fact that he is

18  asserting a federal claim. *See Duncan v, Henry*, 513 U.S. 364,

19  365-366 (1995); *Lyons v. Crawford*, 232 F.3d 904 (9th Cir. 2001) (a

20  petitioner exhausts state remedies only if he characterized the

21  claims raised in state court specifically as federal).   Petitioner

22

23       [1] 28 U.S.C. § 2254 (b)(1)-(2) states:
         (b) (1)  An application for a writ of habeas corpus on behalf of a
24       person in custody pursuant to the    judgment of a State court shall
         not be granted unless it appears that -
25          (A) the applicant has exhausted the remedies available in the courts
    of the State; or
26          (B)(i) there is an absence of available State corrective process; or
    (ii) circumstances exist that                 render such process ineffective
27  to protect the rights of the applicant.
         (2) An application for a writ of habeas corpus may be denied on the
28  merits, notwithstanding the failure of the applicant to exhaust the remedies
    available in the courts of the State.

must make the federal basis of the claim explicit, either by specifying particular provisions of the federal constitution or statutes or by citing federal case law. *Insyxiengmay v. Morgan*, 403 F.3d 657, 688 (9th Cir. 2005). To present a claim fairly to the state courts requires Petitioner to describe both the operative facts and the federal legal theory. *Anderson*, 459 U.S. at 6. The constitutional claim raised in the federal proceedings must be the <u>same</u> as that raised in the state proceedings. *See Anderson*, 459 U.S. at 6.

This Court may not grant relief on an unexhausted claim, but it may deny such a claim if it clearly lacks merit. 28 U.S.C. § 2254(b)(2); *Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir. 2005). Gehrke's claim falls within this category.

As noted above, Gehrke never raised his claim in the California Supreme Court. Thus, this Court must "look through" to the last reasoned state court decision to address the claim, the California Court of Appeal opinion denying Gehrke's appeal of his conviction, as the basis of its analysis. *Ylst*, 501 U.S. at 801-06.

In denying Gehrke's claim, the California Court of Appeal stated:

> The jury found true the enhancement alleging Gehrke personally inflicted great bodily injury in connection with the assault on Williams within the meaning if section 12022.7, subdivision (a). Gehrke asserts the court erred by instructing the jury with the so-called "group beating" portion of CALJIC No. 17.20, arguing the group beating provisions of CALJIC No. 17.20 erroneously state the circumstances under which a defendant may be liable under section 12022.7, subdivision (a). Gehrke notes that section 12022.7, subdivision (a), as construed in *People v. Cole* (1982) 31 Cal.3d 568, requires a defendant personally inflict the injury and cannot be imposed on someone who merely aids and abets another attacker. (*Id.* at p. 572.) Gehrke asserts that

CALJIC No. 17.20 erroneously permits a jury to find the defendant personally inflicted great bodily injury in connection with an assault under an aider and abettor theory, because the "second" group beating theory of CALJIC No. 17.20 would permit a jury to find a defendant liable for the enhancement if the defendant "participate[d]" in a group beating, *and* "it is not possible to determine which assailant inflicted a particular injury," and "at the time that the defendant personally applied unlawful physical force to the victim, the defendant knew that other persons, as part of the same incident, had applied, were applying, or would apply unlawful physical force upon the victim and the defendant knew or reasonably should have known that the cumulative effect of all the unlawful physical force would result in great bodily injury to the victim." Gehrke asserts this second alternative permits a jury to find the enhancement true as long as the defendant had knowledge of the purpose of the other attackers even though the defendant's actions did not contribute to the injury.

This precise claim was considered in, and rejected by, the court in *People v. Modiri* (2006) 39 Cal.4th 481.  In *Modiri*, the defendant argued CALJIC No. 17.20 was inconsistent with *Cole*.  The *Modiri* court, rejecting the defendant's critique of the second alternative of CALJIC No. 17.20, stated:

> "Defendant also parses the second group beating theory. It allows the jury to [find personal infliction of great bodily injury] if the defendant 'personally applied unlawful physical force' to the victim while he '*knew*' others were applying similar force at the same time, and while he '*knew, or reasonably should have known*', that the cumulative effect of all [such] force would result in great bodily injury.' (CALJIC No. 17.20, italics added.)  According to defendant, the italicized language should not have appeared in the instruction, because it substituted his knowledge of the force applied by others for the injury that he was personally required to inflict.  He claims this approach allowed 'vicarious' liability [for personal infliction of great bodily injury] in violation of controlling law. [¶] The asserted error did not occur.  We have seen that [the statute] requires the defendant to personally inflict, or contribute to the infliction of, great bodily harm while participating in a group attack. [Citation.] The second group beating theory in CALJIC No. 17.20 follows this principle by requiring the defendant to apply physical force directly to the victim to such a significant degree that he adds to the 'cumulative' injurious effect.  Contrary to what the defendant claims, this language does not define the defendant's personal infliction of great bodily harm primarily or solely in terms of the harmful acts that others in the

group commit." (*Id.* at pp. 500-501.)

Thus, *Modiri* has concluded that CALJIC No. 17.20 correctly instructs a jury of the circumstances under which a defendant can be liable for personally inflicting great bodily injury. We are bound by the majority opinion in *Modiri* (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455), and therefore reject Gehrke's claim that the court's instruction was erroneous.

(Resp't Lodgment No. 6 at 9-10.)

To the extent Petitioner claims the jury instructions were incorrect under state law, his claim is not cognizable on federal habeas review. *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991). To merit relief, clearly established law provides that a petitioner must show the instructional error so infected the entire trial that the resulting conviction violated due process. *Id.* at 72; The allegedly erroneous instruction must be considered in the context of the entire trial record and the instructions as a whole. *Id.* at 72; *Henderson v. Kibbe*, 431 U.S. 145, 156 (1977); *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973). The instructions must be more than just erroneous; Gehrke must show that there was a reasonable likelihood that in light of the instructions as a whole, the jury applied the challenged instruction in such a way that his constitutional rights were violated. *See Carriger v. Lewis*, 971 F.2d 329, 334 (9th Cir. 1992) (en banc).

In the present case, Officer Bennett testified that he saw Gehrke approach Williams from behind and strike the first blow. (Resp't Lodgment No. 2 at 129, No. 4 at 12.) Muncy approached Williams face to face and immediately proceeded to strike Williams as Gehrke continued striking him as well. (Resp't Lodgment No. 2 at 129, No. 4 at 12.) Williams sustained various injuries; however, the puncture wounds to his chest and back were the most serious

injuries inflicted. (Resp't Lodgment No. 2 at 195-197, 246-246, 248; No. 4 at 12.)

Muncy testified that when he first confronted Williams the two were face to face. (Resp't Lodgment No. 2 at 300, No. 4 at 13.) Muncy first stabbed Williams in the stomach and possibly in the neck. (Resp't Lodgment No. 2 at 299-303, No. 4 at 13.) Muncy also testified that he stabbed Williams in the legs after Williams had fallen to the ground. (Resp't Lodgment No. 2 at 302-303, No. 4 at 13.) Muncy never described stabbing Williams in the back, although he stated that he could not recall exactly what happened. (Resp't Lodgment No. 2 at 299-303, No. 4 at 13.)

The evidence at trial demonstrated that Gehrke personally and independently inflicted great bodily injury upon Williams. (Resp't Lodgment No. 4 at 13.) Although Muncy testified that he attacked Williams and that Gehrke was not involved, the prosecution provided evidence that Gehrke was actively involved in the attack and had even struck the first blow. (Resp't Lodgment No. 2 at 129, No. 4 at 12.) Furthermore, the appellate court determined that the "group beating" jury instruction "correctly instructed the jury of the circumstances under which a defendant can be liable for personally inflicting great bodily injury." (Resp't Lodgment No. 6 at 10.) Therefore, not only is Gehrke's jury instruction claim not cognizable under federal law, but it also fails because the jury instruction was not erroneous. (*Id.* at 11.) Accordingly, the jury instruction did not infect the entire trial, thereby resulting in Gehrke's conviction, because the jury instruction was not in error, but was in accordance with state law. Thus, the Court RECOMMENDS that Petitioner's claim in this regard be DENIED.

07cv0575

**V.**

**CONCLUSION AND RECOMMENDATION**

For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation; and (2) directing that Judgment be entered denying the Petition.

**IT IS ORDERED** that no later than <u>December 20, 2007</u>, any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court  and  served  on  all  parties  no  later than <u>January 4, 2008</u>.  The  parties  are  advised that failure to file objections with the specified time may waive the right to raise those objections on appeal of the Court's order.  See <u>Turner v. Duncan</u>, 158 F.3d 449, 455 (9th Cir. 1998); <u>Martinez v. Ylst</u>, 951 F.2d 1153, 1156 (9th Cir. 1991).

DATED:  November 20, 2007

_____
Hon.  Leo S. Papas
U.S. Magistrate Judge

07cv0575